## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

**ZUMBA FITNESS, LLC**                                                                              **PLAINTIFF**

**v.**                                                   **CASE NO. 2:15-cv-02151**

**ABF LOGISTICS, INC., d/b/a**
**ABF MULTIMODAL, INC., and**
**QUICK COOL TRANSPORT, LLC**                                                    **DEFENDANTS**

**ABF LOGISTICS, INC., d/b/a**
**ABF MULTIMODAL, INC**                                                          **CROSS CLAIMANT**

**v.**

**QUICK COOL TRANSPORT, LLC**                                          **CROSS DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Now pending before the Court are cross-Motions for Partial Summary Judgment filed by Defendant ABF Logistics, Inc. ("ABF Logistics") (Doc. 25), and Plaintiff Zumba Fitness, LLC ("Zumba") (Doc. 31), and a Motion to Strike filed by Zumba (Doc. 35). The motions have been fully briefed and are ripe for decision. For the reasons stated herein, Zumba's Motion to Strike (Doc. 35) is **DENIED**. ABF Logistics' Motion for Partial Summary Judgment (Doc. 25) is **GRANTED IN PART** and the Court **DEFERS RULING** in part. Zumba's Amended Motion for Partial Summary Judgment (Doc. 31) is **DENIED**.[1]

### I.      BACKGROUND

This case involves a shipment of fitness apparel and DVDs that was stolen en route from Miami to Orlando for a fitness convention and trade show. Zumba is a Florida LLC with its principal place of business in Hallandale Beach, Florida. It is a widely-

---

[1] In addition, Zumba's original Motion for Partial Summary Judgment (Doc. 28) is **MOOT**.

1

known global lifestyle and fitness brand that provides products and services—most notably its dance fitness program—to customers worldwide. ABF Logistics is an Arkansas corporation with its principal place of business in Fort Smith, Arkansas. It is a wholly owned subsidiary of ABF Logistics II, Inc., which in turn is a wholly owned subsidiary of ArcBest Corporation. ArcBest also has a wholly owned subsidiary called ABF Freight Services, Inc. According to its website, ABF Logistics "provides third-party logistics services including brokerage, intermodal, ocean transport, transportation management, warehousing and household moving." (Doc. 27-2, p. 27). And, when "shipments do not fit on ABF vans or need special equipment," its d/b/a ABF Multimodal, Inc., "offers alternative options from a network of reliable carriers." *Id.* at 29. Quick Cool Transport, LLC ("Quick Cool") defaulted in this case, but is apparently a Florida LLC with its principal place of business in Hialeah, Florida.

In June of 2014, Zumba sought to transport certain goods from Miami, Florida to Orlando, Florida for a fitness convention at the Orlando Convention Center. Working with Ozburn-Hessey Logistics, LLC ("OHL")—a company it uses for warehousing and related services—Zumba engaged ABF Logistics to arrange the transportation of five[2] freight trailers from Miami to Orlando. ABF Logistics then engaged Oliva Delivery Corp. ("Oliva") and Gemcap Trucking to effect the transportation of the goods. The goods

---

[2] It is somewhat unclear to the Court whether the shipment included five or six trailers. The Complaint alleged five, (Doc. 23, ¶ 16), and one email from Heidy Hernandez of OHL lists five pickup times for the trailers. (Doc. 27). However, another email from Hernandez lists six pickup times, *id.*, and ABF's Statement of Undisputed Facts vacillates between listing "five" and "six" as the correct number of trailers. (Doc. 27, ¶¶ 12-15). Whether there were five or six trailers involved is ultimately unimportant to the Court's decision, but the Court will continue to use the figure "five" to avoid confusion.

were to be picked up on August 8, 2014 at OHL's Miami warehouse, and transported to Orlando in time for August 11, 2014.

On August 7, 2014, a representative from Oliva informed ABF Logistics that it could not provide a truck for one of the five shipments. David Moore of ABF Logistics then contacted Quick Cool to see if it could take Oliva's place in transporting one of the trailers. Quick Cool agreed, and ABF assigned it to transport the shipment corresponding with Bill of Lading 426306509 ("BOL 509"). Quick Cool's driver, however, ended up with Bill of Lading 426306506 ("BOL 506"). Both BOLs are signed by Alfredo Muñoz, an employee of a company called InfoSonic, Inc. that was located at OHL's Miami warehouse at the time. Both BOLs also identify Oliva as the carrier.

The shipment transported by Quick Cool never made it to Orlando. Instead, the driver of the truck parked in a BJ's Wholesale parking lot, and the truck was stolen. It was later found unlocked and unsecured, with all of its contents removed. On October 17, 2014, Zumba filed a claim with ABF Logistics, indicating a $464,874.94 loss. In a letter dated October 23, 2014, an employee of ABF Freight named Christopher A. Boatright denied Zumba's claim, relying on a $5.00 per pound or $100,000 per trailer limitation of liability provision found in the bill of lading.[3]

Zumba then filed a Complaint (Doc. 1) in this Court on August 3, 2015, seeking a declaration of its rights under the bill of lading, and alleging breach of contract against ABF Logistics and Quick Cool. It later filed an Amended Complaint (Doc. 23) adding a negligence claim against both Defendants. ABF Logistics answered both (Docs. 8, 24),

---

[3] To clarify why an employee of ABF Freight, and not ABF Logistics, was handling Zumba's claim, the bottom of the letter states that "ABF Freight is a cargo claim processing agent for ABF Multimodal, Inc. and merely manages all claims in relation to cargo loss and damage for Multimodal Customers." (Doc. 27-7).

generally denying the claims against it and filing a cross claim against Quick Cool. The Court held a Case Management Hearing with the parties on December 21, 2015. Therein, the Court noted a "fundamental disagreement as to whether, how and to what extent this dispute is governed by the 'Carmack Amendment' [49 U.S.C. § 14706]." (Doc. 19, p. 2) (Interim Case Management Order). The parties agreed that "the scope and expense of the litigation can be best managed by focusing on this 'threshold issue,' prior to engaging in full merits and damages discovery." *Id.* Accordingly, the Court set interim deadlines for discovery and dispositive motions related to the threshold issue of whether, how, and to what extent the Carmack Amendment applies in this case. Pursuant to those deadlines, ABF Logistics filed its Motion for Partial Summary Judgment (Doc. 25) on July 6, 2016. Exhibit C to the Statement of Facts filed contemporaneously with that Motion is an affidavit of Alfredo Muñoz, (Doc. 27-3), which Zumba has moved to strike (Doc. 35). Zumba filed its Motion for Partial Summary Judgment on July 6, 2016 (Doc. 28), and filed an Amended Motion for Partial Summary Judgment (Doc. 31) a day later. All three motions are ripe for decision.

## II.       SUMMARY JUDGMENT LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be

avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   DISCUSSION

### A.   Zumba's Motion to Strike

Zumba asks the Court to strike the affidavit of Alfredo Muñoz, which is attached to ABF Logistics' Statement of Facts. (Doc. 27-3). It asserts two bases for striking the affidavit. First, Zumba contends that ABF Logistics failed to disclose Muñoz as a potential witness in its Rule 26 disclosures. Alternatively, Zumba suggests that Muñoz' affidavit is internally inconsistent with ABF's Statement of Facts and the positions it has taken in this matter, and must be stricken for those substantive reasons. ABF Logistics admits that it did not specifically identify Muñoz in its Rule 26 disclosures, but counters that the following statement from its disclosures satisfies Rule 26: "In addition to the foregoing [list of potential witnesses], ABF reserves the right to use as witnesses any persons . . . identified as persons with knowledge or potential witnesses by any party in discovery." (Docs. 38, pp. 4-5; 35-1, p. 3; 35-1, p. 7). In OHL employee Cari Cossio's deposition, that argument continues, she identified Muñoz as the signee of the bill(s) of

5

lading at issue in this case, bringing him within the scope of the aforementioned clause. Alternatively, ABF Logistics submits that any failure to disclose Muñoz was substantially justified and was harmless, and that there are no substantive issues with his affidavit that would warrant striking it.

Federal Rule of Civil Procedure 26(a)(1)(A)(i), "Initial Disclosures," provides that a party must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e) then provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Finally, under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."

To be sure, best practice would have been for ABF Logistics' counsel to supplement his initial disclosures to specifically identify Muñoz. Nonetheless, ABF Logistics' actions were consistent with Rule 26. Under Rule 26(e), a party must supplement or correct its initial disclosures only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Ironically, a case provided to the Court by Zumba

illustrates how Rule 26(e) applies favorably to ABF Logistics in the instant case. In *Green v. Logan's Roadhouse, Inc.*, 2014 WL 6871196 (S.D. Miss. Dec. 3, 2014), the court declined to strike an affidavit because the moving party "knew [the witness's] identity and his alleged role in the events leading to this lawsuit throughout the entire discovery period." *Id.* at 1. While the non-moving party in *Green* did more to notify his opponent of the witness, the principle carries to the instant case. Cari Cassio was the first witness deposed by the parties, *see* Doc. 30-3, p. 8, and she discussed Muñoz' involvement in the case at length, *id.* pp. 6-7. Moreover, Muñoz signed the bill(s) of lading at issue in this case. (Docs. 27-1, p. 4; 30-4, p. 4). It would stretch credulity to assume that Zumba's counsel was unaware of Muñoz' identity and his role in the events leading to this lawsuit.

But even if ABF Logistics' counsel's failure to supplement its initial disclosures violated Rule 26, that failure was substantially justified and harmless. In evaluating a failure to disclose, courts should consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *see also Jenkins v. Med. Labs. of E. Iowa, Inc.*, 880 F. Supp. 2d 946, 956 (N.D. Iowa 2012) (applying the *Wegener* factors and finding that a failure to disclose was substantially justified and harmless).

The Court's analysis focuses on the first two *Wegener* factors. As to the reason for noncompliance, ABF Logistics' counsel "believed Mr. Muñoz has been disclosed by Zumba's witness in discovery and that no further disclosure of Mr. Muñoz was

7

necessary." (Doc. 38, p. 4). This was certainly a reasonable assumption for counsel to draw, and it serves as a factor against striking the affidavit. Next, as discussed above, there is no surprise or prejudice to Zumba. Muñoz was identified early on in the discovery process, and Zumba was well aware of his role in the events leading up to the case. Far from coming out of left field, Muñoz is a witness positioned squarely within the infield diamond. Moreover, including Muñoz' affidavit as an exhibit to ABF Logistics' Motion does not prejudice Zumba because all of the material information contained in the affidavit is also found in Cossio's uncontroverted deposition testimony. Indeed, given Cossio's deposition, Muñoz' affidavit has no effect on the outcome of the parties' cross-Motions for Partial Summary Judgment.

Finally, Muñoz' affidavit is not "internally inconsistent with ABF's Statement of Facts and the positions it has taken in this matter." (Doc. 35, p. 3). Zumba offers two examples that supposedly show an internal inconsistency. The first is that ABF Logistics' Statement of Facts claims "the driver was given [BOL 506] by Alfredo Muñoz," (Doc. 27, ¶ 17 (citing to Muñoz' affidavit)), yet "nowhere in the Affidavit does Mr. Muñoz state that he was the one who gave the driver the Bill of Lading." (Doc. 35, ¶ 10). This minor discrepancy between the exact phraseology of Muñoz' affidavit and ABF Logistics' Statement of Facts does not create an internal inconsistency anywhere near sufficient to warrant striking the affidavit: The exact manner in which the bill(s) of lading changed hands from Muñoz to the drivers is simply unimportant to the Court's adjudication of the instant Motions for Partial Summary Judgment.

Zumba's second example similarly does not evince an internal inconsistency. It argues that because Muñoz—who signed the relevant bill(s) of lading—identifies

himself as neither an employee of Zumba or OHL, his affidavit is inconsistent with ABF Logistics' argument that Zumba is bound by the bill(s) of lading. This is certainly a legal argument that Zumba has made, but Zumba's disagreement with ABF Logistics about the legal consequences of Muñoz' involvement does nothing to render his affidavit inconsistent with ABF Logistics' position. To the contrary, as the Court will discuss below, that position is quite consistent.

In sum, Zumba's Motion to Strike (Doc. 35) is **DENIED.** ABF Logistics did not violate Rule 26, and even if it did, its failure to disclose was substantially justified and harmless. Muñoz' affidavit also is not internally inconsistent with any of ABF's positions. Finally, the Court notes that the inclusion of Muñoz' affidavit in these proceedings does not affect the Court's adjudication of the parties' Motions for Partial Summary Judgment.

### B.   Applicability of the Carmack Amendment to ABF Logistics

Having disposed of Zumba's Motion to Strike, the Court turns its attention to the parties' cross-Motions for Partial Summary Judgment. As noted above, the parties have a fundamental disagreement about the applicability of the Carmack Amendment to this case. This disagreement manifests itself in two forms. First, the parties disagree on whether the Carmack Amendment is at all applicable to Zumba's claims against ABF Logistics. Second, assuming it is applicable, the parties disagree on whether a limitation of liability provision included in the relevant pricing schedule and bill(s) of lading complies with the Carmack Amendment. The Court finds that the Carmack Amendment does not apply to Zumba's claims against ABF, so it does not reach the second part of the parties' dispute.

### 1.    Carmack Amendment Legal Principles

The Carmack Amendment provides, in relevant part, that "[a] carrier providing transportation or service . . . shall issue a receipt or bill of lading for property it receives for transportation . . . . That carrier and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1). "The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson*, 339 U.S. 113, 119 (1950). A carrier may, however, limit its liability under certain circumstances by establishing

> rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(1)(A).

Crucially, it is well established that the Carmack Amendment applies to carriers and freight forwarders, not brokers. *E.g.*, *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997) ("The Carmack Amendment . . . imposes liability . . . on 'carriers' and 'freight forwarders.'"); *Hewlett-Packard Co. v. Brother's Trucking Enters., Inc.*, 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) ("The Carmack Amendment governs carriers, not brokers."); *Lumbermens Mut. Cas. Co. v. GES Exposition Servs., Inc.*, 303 F. Supp. 2d 920, 921 (N.D. Ill. 2003) ("[T]he question is whether GES was a broker (in which case it is not liable under the amendment) or a carrier or freight forwarder (in which case it is liable)."). The Carmack Amendment defines "Broker" as "a person, other

10

than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). The term "Carrier" means "a motor carrier, a water carrier, and a freight forwarder." *Id.* at 13102(3). "Motor Carrier," in turn, is defined as "a person providing motor vehicle transportation for compensation." *Id.* at 13102(14). And, a "Freight Forwarder" is

> a person holding itself out to the general public . . . to provide transportation of property for compensation and in the ordinary course of its business—
>
> **(A)** assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
>
> **(B)** assumes responsibility for the transportation from the place of receipt to the place of destination; and
>
> **(C)** uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

*Id.* at 13102(8). A pertinent federal regulation adds (and simplifies):

> Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2.

The question facing this Court, then, is whether ABF Logistics was a broker or a carrier or freight forwarder. "The difference between a carrier and a broker is often blurry." *CGU Intern. Inc., PLC v. Keystone Lines Corp.*, 2004 WL 1047982, at *2 (N.D.

11

Cal. May 5, 2004). Relying on 49 C.F.R. § 371.2, some courts have described the "crucial distinction" between the two as "whether the party legally binds itself to transport." *ASARCO LLC v. England Logistics Inc.*, 71 F. Supp. 3d 990, 995 (D. Ariz. 2014). That is, "if the defendant accepted responsibility for ensuring delivery of the goods, regardless of who actually transported them, then the defendant qualifies as a carrier." *Id.* (alterations omitted) (quoting *CGU*, 2004 WL 1047982, at *2). On the other hand, if "the defendant merely agreed to locate and hire a third party to transport the shipment, then it was acting as a broker." *Id.* (alterations omitted). This inquiry generally rests on "how [the company] holds itself out to the world and its relationship to the shipper." *Lumbermens*, 303 F. Supp. 2d at 922; *ASARCO*, 71 F. Supp. 3d at 995 ("Whether a company is a broker or a carrier is not determined by what the company labels itself, but by how it represents itself to the world and its relationship to the shipper." (quoting *Hewlett Packard*, 373 F. Supp. 2d at 1352)); *Travelers Ins. v. Panalpina Inc.*, 2010 WL 3894105, at *5 (N.D. Ill. Sept. 30, 2010) (stating that the "carrier" or "broker" analysis "focuses on the nature of the relationship between [the parties], not the label put on [the carrier's or broker's] services").[4]

---

[4] The Court notes some disagreement in the case law about whether the relevant inquiry is how the party "held itself out" to the world generally, or to the shipper specifically. *Compare Lumbermans*, 303 F. Supp. 2d at 922, *with Active Media Servs., Inc. v. CAC Am. Cargo Corp.*, 2012 WL 4462031, at *3 (S.D.N.Y. Sept. 26, 2012) (declaring that "entities that hold themselves out to be carriers may be subject to carrier liability, but only if they hold themselves out as carriers *in the specific transaction at issue*" (emphasis in original)). This is a dispute the Court need not resolve, as either way, ABF Logistics did not hold itself out as a carrier.

### 2.      The Relationship Between Zumba and ABF Logistics: Documents and Written Communications

The first step in the Court's analysis will be examining the relationship between Zumba and ABF Logistics. Of tremendous consequence to the Court's disposition are the voluminous references in documents and communications between the parties describing ABF Logistics as a broker, and distinguishing it from carriers. *Cf. CGU*, 2004 WL 1047982 at *2 (finding party to be a broker in part because the relevant contract identified it as "the broker" and another party as "the carrier"); *Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 292 (1st Cir. 1993) (distinguishing between a "broker" and a "household goods agent" based on the language of the relevant contract). For example, both BOL 506 and 509 identify "Oliva Delivery Corp" as the "carrier." (Docs. 27-1, p. 4; 30-4, p. 4). Both state that "for payment, carriers should bill" ABF Multimodal. *Id.* Both detail ABF Multimodal's cargo liability limitation, and then state "Carrier's cargo liability shall be as set forth" in a separate document. *Id.* Perhaps most importantly, both BOLs contain the following provision:

> ABF Multimodal, Inc. ("ABF Multimodal") performs transportation services under this bill of lading *as a licensed Property Broker and your agent. Carrier(s) hired by ABF Multimodal to perform services for you are your subagent(s) and only a non-agent independent contractor to ABF Multimodal.* Cargo has been received in good order, except as noted . . ., which *ABF Multimodal agrees to arrange for you to be carried to destination by carrier(s).*

*Id.* (emphasis added).

The pricing schedule "used by ABF Multimodal for this shipment," Doc. 29, ¶ 9 (citing Doc. 27-1, p. 6), contains identical language. (Doc. 27-1, p. 6).[5] The tariff

---

[5] ABF Multimodal Account Manager Scott Sharpe's affidavit declares that the pricing schedule attached to his affidavit—"Pricing Schedule #: DPK2211624"—was the pricing

applicable to the transaction—Tariff MM-100—distinguishes ABF Multimodal as a broker, rather than a carrier, no less than 15 times.[6] *E.g.*, (Doc. 27-1, p. 11) (ABF Multimodal "is a property broker of transportation services . . . ."); *id.* ("ABF Multimodal provides transportation brokerage services . . . ."); *id.* at 12 (The Bill of Lading "shall

---

schedule he sent to Zumba "for the shipment at issue in this case." (Doc. 27-1, pp. 2, 6). ABF Logistics states the same in its Statement of Facts. (Doc. 27, ¶ 9). In its Response to ABF Logistics' Statement of Facts, Zumba appears to not dispute that DPK2211624 is the relevant pricing schedule, stating: "*The pricing schedule has been supplied to the Court and has the terms provided*; however, those terms do not comply with the Carmack Amendment . . . ." (Doc. 37, ¶ 9 (emphasis added)). However, in the Statement of Facts accompanying its own Motion for Partial Summary Judgment, Zumba references a pricing schedule with the number "NT72212124-E," which does not contain the above-quoted language.

To the extent that this creates an issue of fact about which pricing schedule applies, the Court finds that it is not an issue of *material* fact. Regardless of which pricing schedule applies, the totality of the documentary evidence, actions of the parties, and manner in which ABF Logistics (and, more importantly, ABF Multimodal) "held itself out" to Zumba and the public establishes that no reasonable jury could find ABF Logistics to be a carrier or freight forwarder under the Carmack Amendment.

[6] Zumba contends that the Court should not consider the tariff because "it was never provided to Zumba," and although it was "'made available upon request' within the terms of the pricing schedule," that scheme of "reference to another document is disallowed by the Carmack Amendment." (Doc. 36, p. 4). As to the latter part of Zumba's argument, its assumption that the Carmack Amendment applies is a classic example of circular reasoning. The entire purpose of looking to the documents that define the parties' relationship *is to determine whether the Carmack Amendment applies*. As one of the documents that define the parties' relationship, the tariff is of course probative of whether ABF Logistics was a broker or a carrier.

With respect to Zumba's point that the tariff was never provided to it, the pricing schedule explicitly states: "By accepting service hereunder, you agree to the terms, conditions, and pricing contained in the . . . MM-100 Series tariff (available upon request or at abfmultimodal.com)." (Doc. 27-1, p. 7). BOLs 506 and 509 contained materially identical clauses. (Docs. 27-1, p. 4; 30-4, p. 4). The Court will not ignore the terms of a document so clearly incorporated into the parties' agreement simply because Zumba failed to read it. *See Bryton Dairy Prods., Inc. v. Harborside Refrigerated Servs., Inc.*, 991 F. Supp. 977, 984 (N.D. Ill. 1997) (rejecting argument that party "had never been made aware of 'Terms and Conditions of Service' printed in small type" on invoices, because its "asserted ignorance [was] no basis for declining to apply" a term of the invoices).

14

govern shipments *arranged* by ABF Multimodal.") (emphasis added); *id.* at 14 (Customers may be liable for "any such charges imposed on ABF Multimodal by the transporting carrier."); *id.* at 15 ("ABF Multimodal or the carrier shall not be liable . . . ."); *id.* at 16 ("ABF Multimodal may assist the claimant in filing claims with the transporting carrier."). Finally, in an email chain leading up to the August 8, 2014 pickup date, Multimodal Account Manager Scott Sharpe wrote, "[t]he deliveries are also all set *with the carriers*," and "we will let *the carrier* know[,] we have *two carriers* doing all of these for us," and "[t]he deliveries are also all set *with the carriers*." (Doc. 27-2, pp. 30, 33, 34 (emphasis added)).

In noting the overwhelming number of references to ABF Multimodal as a broker and other parties as carriers, the Court is cognizant that "[w]hether a company is a broker or a carrier is not determined by what the company labels itself . . . ." *ASARCO*, 71 F. Supp. 3d at 995. However, a party's bare assertion that it is a broker rather than a carrier is highly distinguishable from repeated contractual references to a party's role and identity in a transaction. *Compare Travelers Ins.*, 2010 WL 3894105, at *6 (discounting company president's testimony that it was a "broker"), *with CGU*, 2004 WL 1047982, at *2 (relying on references to "broker" and "carrier" in the contract). This is so because the purpose of the Court's inquiry is to determine the relationship of the parties. Looking to how the parties were described in the documents *that governed their relationship* (and in communications between the parties) has tremendous probative value towards that end.

### 3.     The Relationship Between Zumba and ABF Logistics: The Parties' Conduct

The way the parties' relationship is described on paper is not the sole factor in defining the nature of that relationship. The Court must also look to how the parties actually conducted themselves throughout the transaction in question. This inquiry only supports what the aforementioned documents so strongly suggest: ABF Logistics was a broker.

First, ABF Logistics did not supply the trucks or the drivers to transport Zumba's shipment. This fact alone is not outcome-determinative, as "[o]ne is not precluded from being a motor carrier by the mere fact that none of its own motor vehicles are used in the transporting of goods." *Custom Cartage, Inc. v. Motorola, Inc.*, 1999 WL 9655686, at *8 (N.D. Ill. Oct. 15, 1999). But, it is a factor that when taken together with others suggests that ABF Logistics was acting as a broker.

Second, ABF Logistics had no role in packing or loading Zumba's goods. *See Lumbermans*, 303 F. Supp. 2d at 921 (finding a question of fact as to whether the defendant was a carrier or broker in part because it "packed and loaded the equipment onto [the] truck"); *Delta Research Corp. v. EMS, Inc.*, 2005 WL 2090890, at *6 (E.D. Mich. Aug. 29, 2005) (finding a question of fact in part because the alleged carrier agreed to "load and supply trucking," and handled the "specialized lifting and loading" for a piece of equipment). In fact, ABF Logistics "never took physical possession" of the goods at all. *CGU*, 2004 WL 1047982, at *2. The trucks were loaded at OHL's Miami warehouse, entirely by OHL's employees (and Alfredo Muñoz). (Doc. 30-3, pp. 6-7) (Cossio Dep.).

Third, Zumba and OHL instructed ABF Logistics as to the pickup times at OHL's Miami warehouse. Heidy Hernandez of OHL emailed Scott Sharpe of ABF Logistics on August 6, 2014, to tell him that "the appt. times are 10, 11, 12, 1, 2, & 3 pm." (Doc. 27-2, p. 30); *see also id.* at 33 (Hernandez instructing Sharpe to "please schedule the truckers to arrive as follows: 9 am, 10 am, 11 am, 2 pm and 3 pm"). That OHL and Zumba, not ABF Logistics, controlled the pickup times—along with the pickup location and the physical packaging and loading—evinces that ABF Logistics had a low degree of control over the actual transportation of Zumba's goods. *See Hewlett-Packard*, 373 F. Supp. 2d at 1352 (considering the measure of control exerted over the transportation process as a factor in the carrier-or-broker analysis). This, in turn, is evidence that ABF Logistics did not "accept[] responsibility for ensuring delivery of the goods," but rather "agreed to locate and hire a third party to transport the shipment." *CGU*, 2004 WL 1047982, at *2.

Fourth, Zumba and OHL were well-aware that third-party carriers would be transporting the goods. This fact was referenced repeatedly in documents and emails, and would have been known to OHL personnel through their first-hand observations during the scheduled pickups. Again, while this fact is not wholly dispositive of ABF Logistics' status, it is relevant to the relationship of the parties, and how ABF Logistics held itself out to Zumba and OHL. *See Delta Research Corp.*, 2005 WL 2090890, at *6 (shipper's president's testimony that he was unaware "that someone other than [the alleged carrier] would actually transport [the equipment]" helped create a genuine issue of material fact).

### 4. The Relationship Between Zumba and ABF Logistics: Zumba's Counterarguments

Taken together, the four factors discussed above compliment the written descriptions of the parties' relationship to show definitively that the nature of their relationship was one of a broker and a shipper, not a carrier and a shipper. Zumba offers several arguments to undermine this conclusion, but none achieve their intended purpose. Two are worth discussing in some detail.

Zumba's main counterargument revolves around ABF Logistics' alleged failure to disclose Quick Cool as the transporter of the eventually stolen truck. As a result of Quick Cool's undisclosed status, Zumba argues, Quick Cool must be considered an agent of ABF Logistics. It then follows that ABF Logistics was an "agent of a motor carrier," and thus not a broker under the Carmack Amendment. 49 U.S.C. § 13102(2).

This argument fails for two reasons. First, the Court disagrees that Quick Cool was undisclosed to Zumba. OHL was "extremely busy" on August 8, 2014, when the trucks arrived to pick up Zumba's shipment. (Doc. 30-3, p. 6) (Cossio Dep.). Accordingly, OHL "authorized" Muñoz to sign off on the shipments, even though he wasn't an OHL employee. *Id.*[7] Muñoz, acting as OHL's agent, who was in turn acting as

---

[7] The key part of Cossio's deposition reads as follows:

> Q: . . . So is it always the case that when [a bill of lading] says, ["]shipper, OHL,["] that it would be someone associated with OHL who is signing that document?
>
> A: Someone that's in the warehouse at that time; that's correct.
>
> Q: Okay. In this case, it just so happened to be someone [Muñoz] who worked for InfoSonics?
>
> A: That's in our facility; correct.

18

Zumba's agent, interacted with Quick Cool's driver and signed off on the shipment that Quick Cool picked up. *Id.* at 6-7; (Doc. 27-3) (Muñoz Dep.). This included copying "the person's driver's license," signing bill(s) of lading under the "shipper signature" field, marking the relevant "seal" and "trailer" numbers, and noting the truck's time of arrival. (Doc. 27-3). Acting as an agent to OHL, Muñoz signed off on Quick Cool picking up Zumba's goods, despite the bill(s) of lading referring to "Oliva Delivery Corp" as the carrier, (Docs. 27-1, p. 4; 30-4, p. 4), and despite ABF Multimodal's "Shipper's Loading Instructions," which state: "Please confirm that this carrier requesting the load is the carrier named on the bill of lading. If someone other than the named carrier is requesting this load, please call 877-279-8090 immediately," (Doc. 27-1, p. 5).

Even if, despite OHL's grant of authority to Muñoz, Quick Cool could somehow be considered "undisclosed" as to Zumba, the fact that a carrier's identity may be undisclosed does not *de facto* transform a broker into a carrier for purposes of the Carmack Amendment. *See Active Media Servs.*, 2012 WL 4462031, at *4 ("That AMS was not told the name of the carrier does not negate the fact that AMS retained AWIS for a particular purpose."). The cases relied on by Zumba for the opposite proposition

---

Q: So how does that work? How is he acting on behalf of OHL?

A: Well, we're a small operation and we had InfoSonics in-house as well as our team. If we have an overflow of merchandise coming in and out, at times he would come over and just help, meaning he's not interacting directly, indirectly with the freight and giving us some support.

Q: In that case, would he be authorized then to deal with the carrier?

A: In that particular case, he was authorized to actually sign off.

*Id.* at 7.

19

are readily distinguishable. In *Travelers*, 2010 WL 3894105, the court found the defendant to be a carrier not because it failed to disclose the identity of a third-party carrier, but because it failed to notify the shipper that it would be using a third-party carrier *at all. Id.* at 5 ("Panalpina *never knew about the second Delivery Order* or Buckley's role in transporting the containers." (emphasis added)).

Zumba also assigns more weight to *Titan Transp., Inc. v. O.K. Foods, Inc.*, 2013 Ark. App. 33, than it can bear. This is so for two reasons. First, *Titan Transportation* involved questions of Arkansas common law, not the Carmack Amendment or any other provision of federal law. Second, even assuming (without deciding) that Arkansas law would be the applicable state law to determine whether an agency relationship existed between ABF Logistics and Quick Cool, *Titan Transportation* would not support a positive finding. That case states:

> Although it is well established that a broker cannot be held personally liable to the third party upon a contract for a disclosed principal, *and if the third party knew, or had sufficient knowledge to create an inference, that the broker was acting for another, then the broker is not liable*. [B]ut, *if he does not disclose his principal nor the fact that he is acting as a broker* and deals personally, then he is liable . . . .

*Id.* at *2 (first emphasis added, second emphasis in original). In *Titan Transportation*, Titan "did not disclose that it was merely a broker," but instead "held itself out to be a carrier." *Id.* at 3. The same cannot be said of ABF Logistics. The instant case is also distinguishable from *Titan Transportation* because, here, the identity of the carrier did not remain undisclosed so that the supposed-broker could "maximize its profit on the transaction." *Id.* at 4. Rather, the previously identified carrier—Oliva Delivery Corp.— informed ABF Logistics *the day before it was supposed to pick up the shipment* that it

was one truck short. The change in identity of the carrier was made by ABF Logistics at the last minute, in an attempt to benefit its agent, Zumba, not itself.

Zumba's other counterargument is that a number of responsibilities assumed by ABF Logistics indicate that it was acting as a carrier. For this, Zumba relies on *Hewlett-Packard* and *Custom Cartage*. Both cases are distinguishable and, more importantly in this Court's view, stretch the definition of "carrier" too far. For example, *Custom Cartage* lists as one factor indicating that a party was a carrier, not a broker, the party's "discretion to hire whom it chose to ship the goods." 1999 WL 965686, at *8. Of course, selecting carriers to transport goods for a shipper *is exactly what brokers are supposed to do*. Similarly, the *Hewlett-Packard* Court relied on the defendant's statements that it could provide value through "consistent and timely transit times with quality carriers" and that it asked its "teams to run an average of 50mph" as indicia of being a carrier, not a broker. 373 F. Supp. 2d at 1352. In this Court's view, promising to select prompt, reliable carriers "might make [a party] a responsible broker, but it does not make it a carrier." *Active Media Servs.*, 2012 WL 4462031, at *4.

### 5.   ABF Logistics Did Not "Hold Itself Out" as a Carrier

Having concluded that ABF Logistics was a broker based on the nature of the relationship between the parties, the Court also believes it appropriate to determine whether ABF Logistics "[held] itself out to the world" as a carrier. *Lumbermens*, 303 F. Supp. 2d at 922. In arguing that it did, Zumba relies on statements from ABF.com. *See* Doc. 30-2, p. 2. The website differentiates ABF Freight from ABF Logistics, and then under the latter's heading states:

> ABF Logistics is a sister company to ABF Freight and provides third-party logistics services including brokerage, intermodal, ocean transport,

> transportation management, warehousing and household moving. We
> have the skill and the will to build and deliver seamless, customized
> supply chain solutions powered by advanced technology with access
> through a single point of contact.

*Id.* Under ABF Logistics' logo, the website describes the company as offering

"comprehensive end-to-end transportation and logistics solutions to a broad customer

base." *Id.* Another section of the website states:

> ABF Logistics, an ArcBest company and a sister company to ABF Freight,
> offers third-party logistics services including brokerage, intermodal, ocean
> shipping, transportation management, warehousing and household goods
> moving. We cover all your needs in one place with inclusive shipping and
> moving services, utilizing ground, air and ocean channels.

*Id.* at 3. Yet another section of the website, which ABF Logistics includes as an exhibit

to its Motion for Partial Summary Judgment, focuses on the services of ABF Multimodal

specifically. In relevant part, that section states: "ABF Multimodal is offered in

association with ABF Logistics, an ArcBest company. When shipments do not fit on ABF

vans or need special equipment, *ABF Multimodal offers alternative options from a

network of reliable carriers*." (Doc. 27-2, p. 29) (emphasis added). The website then lists

three steps a customer can take to obtain ABF Multimodal's services. The second step

is the most relevant: "**Submit your quote.** By requesting a quote, ABF Multimodal will

seek out the best price *and service provider* for your shipments." *Id.* (first emphasis in

original, second emphasis added).

The descriptions of ABF Logistics' services are entirely unremarkable for

purposes of this lawsuit. The website states that ABF Logistics provides a number of

listed "logistics services" including (most pertinently) brokerage. Neither lists "truck" or

"trailer" or "ground" or "road" carrier services. And, even if the references to "intermodal"

or "ocean transport" could broadly be interpreted as references to carrier-like services,

both are far outside the scope of the services sought by Zumba in this case, which in this Court's view decreases their relevance. Nor does ABF Logistics' claim of offering "comprehensive end-to-end transportation and logistics solutions" indicate that it is a carrier. (Doc 30-2, p. 2). The Court will not lay inference upon inference to find that advertisements promoting broad and vague categories of services like "transportation" solutions and "logistics" solutions create questions of material fact about whether ABF Logistics was a carrier.

More importantly, the bill(s) of lading, pricing schedule, and tariff in this case all refer specifically to ABF Multimodal.[8] This makes the section of ABF's website dedicated to its Multimodal entity the most relevant to determining how the company "held itself out." That section unambiguously describes ABF Multimodal's services as being broker-like in nature.

### 6.    ABF Logistics Was Not a Freight Forwarder

Finally, Zumba contends that even if ABF Logistics was not a carrier under the Carmack Amendment, it was a freight forwarder. To prove that a defendant is a Freight Forwarder, a plaintiff must show *each* of the following:

> [the person held itself] out to the general public . . . [as providing] transportation of property for compensation and in the ordinary course of its business—
>
> **(A)** assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
>
> **(B)** assumes responsibility for the transportation from the place of receipt to the place of destination; and

---

[8] In addition, Zumba named ABF Multimodal as a "d/b/a" in this case.

(C) uses for any part of the transportation a carrier subject to jurisdiction
under this subtitle.

49 U.S.C. § 13102(8); *Chemsource*, 106 F.3d at 1361.[9] "With respect to clause

(A) above, the Supreme Court has held that the term 'assembles and consolidates'

means the assembly or consolidation of less than carload quantities into carload

shipments." *Chemsource*, 106 F.3d at 1361 (citing *Chicago, Milwaukee, St. Paul & Pac.*

*R.R. Co. v. Acme Fast Freight, Inc.,* 336 U.S. 465, 467 (1949)). The Supreme Court has

elaborated upon its understanding of what a freight forwarder does in some detail:

> Forwarders utilize common carriers by rail and motor truck to transport
> goods owned by others. *They solicit and obtain many small shipments,*
> from various points within an area, *and cause them to be carried in less*

---

[9] There are at least three different interpretations of this definition that can be
extrapolated from the case law. Under the broadest interpretation, the phrase "holding
itself out to the general public" modifies the remainder of the definition, such that a
plaintiff need only show that a defendant *holds itself out* to offer the enumerated
services. *See Metro. Shipping Agents of Ill. v. United States*, 342 F. Supp. 1266, 1269
(D.N.J. 1972) ("To qualify as a 'freight forwarder' one need not actually perform all of the
functions authorized under [the definition]. As long as a party *proffers* all of the services
. . . it will qualify as a 'freight forwarder.'" (emphasis in original)). Another interpretation
is that the phrase "holding itself out to the general public" modifies only the clause "to
provide transportation of property for compensation," such that a plaintiff must show that
a defendant actually performs the enumerated services. *Accord Bryton Dairy Prods.*,
991 F. Supp. at 982 ("Whether an entity will be considered a freight forwarder as to a
particular shipment for which it does not perform all the freight forwarder services may
depend on the frequency with which its other brokerage/forwarding work involves
providing all the freight forwarder services."). A more narrow interpretation suggests that
the services must be provided in the actual transaction at issue. *See Pac. Austral Party,*
*Ltd. v. Intermodal Exp., Inc.*, 1990 WL 141010, at *2 (N.D. Ill. Sept. 26, 1990) ("That
defendant may, in the ordinary course of its business, have provided freight
consolidation services in other instances is insufficient to make the Carmack
Amendment applicable, since that statute requires both that such services be provided
in the particular instance at issue and that those services have been provided in the
ordinary course of business.").

While the Court believes the second interpretation to be the most consistent with sound
principles of statutory interpretation, it applies the first interpretation in the instant case,
as ABF Logistics cannot be found to be a freight forwarder under even the broadest
understanding of the statute.

> than truck-load or carload lots to a concentration center within the area. There they are *assembled by the forwarder for further transportation in truck-load or carload lots.* Although the forwarder gives owners of individual small shipments his own contract corresponding in form to through bills of lading and assumes responsibility for safe through carriage, the forwarder customarily arranges for the pickup, assembly and transportation of the shipments by carriers for hire. And the forwarders, not the owners of the goods, select the carriers and route the shipments. Upon arrival of a truck-load or carload of the assembled small shipments at a distribution center, *the bulk shipment is broken up, the forwarder separates and takes possession of the original small shipments and arranges, where necessary, their further carriage to their various final destinations in the area served by the particular distribution point.* In this final carriage of the small shipment to its ultimate destination, the forwarder again utilizes carriers for hire to move these less than truck-load or carload lots. Thus, forwarders may use the service of carriers to assemble shipments of less than truck-load or carload lots at their concentration center, to transport the assembled truck-load or carloads to a distribution center and to carry the broken up small shipments beyond their break-bulk distribution center.

*United States v. Chicago Heights Trucking Co.*, 310 U.S. 344, 345–46 (1940) (emphases added). In plainer terms, a freight forwarder: (i) collects a number of small shipments from a particular area; (ii) combines them to make one big shipment; (iii) arranges transportation of the big shipment to a central location; (iv) breaks the big shipment back down into a number of small shipments; and (v) arranges transportation for the small shipments to reach their intended destinations.

Zumba has failed to present any evidence that ABF Logistics either operated as a freight forwarder in this particular case, or generally held itself out to the general public to be a freight forwarder. First, it cannot be seriously contended that ABF Logistics acted as a freight forwarder in this case. Applying the first prong of the statute and the Supreme Court's description thereof, ABF Logistics performed none of the services customarily performed by a freight forwarder. It did not arrange for the consolidation of several small shipments into a large truck-sized shipment; instead,

25

Zumba's shipment filled five trucks. It did not break a shipment down at a central location; instead, the shipments were to be transported directly to their final destination.

Second, the only evidence Zumba offers to suggest that ABF Logistics held itself out as providing freight-forwarding services are the statements from ABF.com discussed *supra* in Section III(B)(5). None of those statements declare or even suggest that ABF Logistics provided freight-forwarding services. If anything, they suggest the opposite. ABF Freight operates a "less-than-truckload" network, and ABF Multimodal solicits shipments that "do not fit on ABF vans," to broker out to third parties. (Doc. 27-2, pp. 27, 29). Thus, while freight forwarders accept small shipments and combine them into large shipments, ABF Multimodal holds itself out as taking large shipments that ABF Freight cannot accommodate, and finding third parties that can.

### 7.  Applicability of the Carmack Amendment to ABF Logistics: Summary

To summarize the Court's lengthy analysis, the Carmack Amendment does not apply to this case because ABF Logistics was a broker—not a shipper or carrier—for purposes of that statute. Both the relevant documents and the parties' respective actions show that their relationship was one between a broker and a shipper. And, ABF Logistics did not "hold itself out" as a carrier. It also did not actually perform the services of, or hold itself out to be, a freight forwarder. Zumba's arguments to the contrary are unavailing, and in particular its argument that Quick Cool was an undisclosed third party is inaccurate given the status of Alfredo Muñoz as an agent of OHL's. Finally, even if it were accurate, it would not change the nature of the parties' relationship for purposes of the Carmack Amendment.

### C.    The Parties' Remaining Arguments

Three pending questions remain unresolved in this case. First, the parties both contest whether ABF Logistics effectively limited its liability under the Carmack Amendment, assuming that Amendment applies. There is no need for the Court to reach this question, as it has already determined that the Carmack Amendment does not apply in this case. Second, ABF Logistics argues that, assuming the Carmack Amendment applies, Zumba's breach of contract and negligence claims are preempted by it. Again, since the Court has now determined that the Amendment does not apply, it need not reach this question. Third, ABF Logistics argues that, regardless of the applicability of the Carmack Amendment, Zumba's negligence claim is preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 14501(c)(1).

Given that the focus of the cross-Motions for Partial Summary Judgment was the applicability of the Carmack Amendment, the third issue is one that was hardly briefed by the parties. ABF Logistics dedicated only a short paragraph to the issue in its Brief in Support of Motion for Partial Summary Judgment (Doc. 26, pp. 11-12), and Zumba included only two paragraphs of analysis in its Response (Doc. 36, pp. 12-13). The Court's initial review of the case law reveals a split on the question of whether the ICCTA preempts state negligence actions against brokers. *Compare ASARCO LLC v. England Logistics Inc.*, 71 F. Supp. 3d 990, 1004-07 (D. Ariz. 2014) (finding preemption)*, with Works v. Landstar Ranger, Inc.*, 2011 WL 9206170 (C.D. Cal. April 13, 2011) (not finding preemption). And, there is apparently no Eighth Circuit precedent on the matter. Given the Court's ruling that the Carmack Amendment does not apply,

the question of ICCTA preemption is now of central importance to Zumba's case. Accordingly, the Court will defer ruling on the question at this time, and invite the parties to submit supplemental briefing, as outlined below.

## IV.   CONCLUSION

For the reasons stated herein, Zumba's Motion to Strike (Doc. 35) is **DENIED**. ABF Logistics' Motion for Partial Summary Judgment (Doc. 25) is **GRANTED IN PART** and the Court **DEFERS RULING** in part. As to the question of whether the ICCTA preempts Zumba's negligence claim, the Court invites ABF Logistics to supplement its Motion (Doc. 25) with a brief not to exceed **10 pages** in length. The brief shall be submitted no later than **30 days** from the entry of this Order. Zumba may supplement its Response (Doc. 36) with a brief not to exceed **10 pages** in length, no later than **14 days** after ABF Logistics files its supplement. ABF Logistics may then submit a reply brief not to exceed **5 pages** in length, no later than **7 days** after Zumba supplements its Response Brief. Finally, Zumba's Motion for Partial Summary Judgment (Doc. 28) is **MOOT**, and its Amended Motion for Partial Summary Judgment (Doc. 31) is **DENIED**.

**IT IS SO ORDERED** on this 30th day of August, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE